Battle, J.
An attentive examination, aided by able arguments of counsel, and by repeated discussion among ourselves, and stimulated by an anxious desire to come to a just conclusion in a case of such great importance, both to the State and to the prisoner, has not enabled us to discover any error, either *425 in the bill of exceptions, or upon the record, which entitles the prisoner to a new trial, or to an arrest of the judgment.
The errors assigned by the counsel for the prisoner, in his bill of exceptions, are the following :
“ 1. That the presiding Judge erred in permitting witnesses to be recalled and re-examined, after the jury had retired to consider of their verdict.
“2. That he erréd because he declined telling the jury that they ought to reject, altogether, the testimony of the witness "Vaughn.
“ 3. That he erred in expressing an opinion as to the truth of a material fact.
“ 4. That in responding to the prayer of the prisoner for a specific instruction, lie erred in telling the jury that if they should think one person, alone, could not have killed the deceased, but the prisoner had a. hand in it,’ they must convict him.
“ 5. That in responding to the prayer of the prisoner for a specific instruction, he erred in not giving it in the .terms required, but avoided the force of it, by making his charge too vague and indefinite.”
1. With respect to the first error assigned, we are saved the trouble of an investigation, because we find that the question which it raises, has been settled against the prisoner by repeated adjudications of this Court. In the case of the State v. Silver, 3 Dev. Rep. 332, it was held that the Court, at the request of the jury, might in its discretion, permit a witness, who had been once examined, to be called again at any time before the verdict was rendered, notwithstanding the witnesses were separated before their first examination, and had since had an opportunity of speaking with each other. Again, in the State v. Rash, 12 Ire. Rep. 382, the Court said that it was a mere discretionary power in the Court below, to permit or refuse, the introduction of additional testimony, after the commencement of the argument of counsel to the'jury. So in the State v. Weaver, 13 Ire. 491, it was stated that whether a witness, *426 who lias once been examined, shall be re-examined, is a question of discretion for the presiding'judge, and that from his decision no appeal would lie to thi? Court.
The principle decided in these cases applies to everything which was permitted to be done in the present case. No witness- was examined who had not been examined before, and each witness who was recalled, testified to facts which had been previously examined and discussed.
2. The question raised by the second error was ably argued by the counsel, fully considered by the Court, and decided against the prisoner, in the State v. J. T. Williams, at the late terrain Raleigh, and not yet reported. (Ante 257.) We have heard nothing in the argument here to change the conslusion to which ive came in that case.
8. The third error assigned, is, that the judge expressed to the jury his opinion, that the deceased came to life death “ by the hand of violence” and not by liis own act. The imputation is, that his Honor, after recapitulating all the facts and circumstances, which had been given in evidence, and relied on by the solicitor to prove that the deceased did not commit suicide, but was killed by another, closed the enumeration thus:. “taking these facts as true, and that was for them, (the jury,) could thereexist any rational ground to doubt as to the fact of killing?” Itisinsisted that this question was putin such aman-ner, as to intimate to the jury that, in his opinion, there could he no doubt as to the killing. “Row it is certain,” as the Court said in McRae v. Lilly, 1 Ire. Rep. 118, “ that this question might have been proposed in such a tone and manner, as to manifest the clear conviction of the inquirer, how it ought to be answered ; but wo cannot intend any circumstances of this sort, and without some peculiarity of tone or manner, intimating the opinion of the speaker, and influencing, or tending to influence, the judgment of those addressed, the question submitted very properly directed the attention of the jury to a material inquiry of fact.”
These remarks furnish, in our opinion, a complete reply to the argument in favor of the imputed error. ¥e think that *427 so far from intending, in the question put by his Honor, any peculiarity of tone or manner injurious to the prisoner, we .might justly infer the contrary, from the care which he took to caution the jury against relying upon any fact, or circumstance, adverse to the prisoner, unless it were proved by unquestionable testimony. The truth is, that the facts which bore upon the inquiry, then under consideration, could not well be called to the attention of the jury, without impressing the hearers, that the narrator and everybody else could have no other belief than that the deceased was killed by some other hand than his own. But yet, it cannot be doubted that the judge was strictly in the line of his duty, while recapitulating the testimony; and the question which he proposed to the jury was a very proper one, unless accompanied with the objectionable tone and manner, which, as has been shown, we have no right to infer. This subject was before the Court, at its late June term in Baleigli, in the case of the State v. Pinckney Williams, (ante 194) upon an indictmentfor larceny; and the very strong circumstances of suspicion against the defendant in that case, made a question propounded to the j nry by the j udge, quite as liable to objection as the one now under consideration ; and yet, we held that there was no error. It is proper to remark further, in justification of his Honor’s charge, that after calling the attention of the jury to all the facts and circumstances relied upon by the State to show the manner of the killing, he proceeded to state those relied on by the prisoner, together with the arguments of his counsel thereon, to show that the deceased’s death was self-inflicted.
4. The instruction prayed by the solicitor, the answer to which gave rise to the fourth exception, was, that if the jury should believe the witness Yaughn “aided and assisted the prisoner in the murder, they should convict on this indictment.” His Honor told the jury, in reply to this, “ that they would consider all the circumstances in evidence, and if they should think one person alone could not do the act, but that the prisoner had a hand in it, it would be their duty to convict on this indictment.” The prisoner’s counsel except to this *428 charge, upon the ground that the expression “ had a hand in it,” was so indefinite in its meaning, that it was calculated to mislead the jury, and was, therefore, erroneous; that by having/ a hand in an aot was commonly understood to mean the being in any way concerned in, or connected with it, by any person, whether present or absent, near the scene of it or at a distance from it. If this were the sense in which his Hon- or’s language might fairly be understood, then it would be erroneous. But we cannot think that such is the fair construction of it. It was spoken with reference to the testimony given on the trial, and must be taken as having been applied to that testimony. The case does not show that anything was said by any of the witnesses tending to prove that the homicide had been procured to be done by some person not present at the time of the killing; and we cannot see, therefore, how the jury could have been .misled by the expression to which the exception is taken. The counsel objected further, that the language was unusual, and never before heard of in a judicial proceeding; but in that they are mistaken, for on the trial of Lord Mohun for murder, before the House of Lords, in 1692, the solicitor-general, in his argument for the Crown, and the Lords, in a question propounded to the judges, use the same expression, in the same sense in which it was employed by his Honor. 4 State Trials, Lord. Mohun's case, at pages 53'7, 545.
The fifth and last error assigned in the bill of exceptions, as the ground of a new trial, is, that his Honor did not give a proper specific instruction, which the prisoner’s counsel prayed, but instead thereof, gave an instruction which was calculated to prejudice the prisoner’s cause. The instruction prayed, was, “that if the jury should doubt whether the deceased was killed by Vaughn or the prisoner, they should acquit.” The instruction given was, that if the jury should “think it was Vaughn, or any other person, or the act of the prisoner, and they doubted as to who did it, the prisoner -was entitled to an acquittal.” The objection is, that the instruction was in more general terms than was requested, whereby its force *429 and. effect were weakened. The counsel for the prisoner insist that the testimony made out a very strong case of suspicion against Yaughn, and that they had a right to have the issue, whether he or .the prisoner committed the homicide, presented singly to the jury; and that his Honor by introducing the supposition that “ any other person ” may have done it, withdrew the attention of the jury from such issue, and thereby prejudiced the case of the prisoner. We admit the prayer of the prisoner was a proper one, and that the judge would have done right in giving the instruction in the very words desired. We admit further, that if the charge, as given, was not substantially what was required, or was calculated to mislead the jury, it was erroneous. Bynum v. Bynum, 11 Ire. Rep. 632. Shelfer v. Gooding, ante 175.
But notwithstanding- the strong reliance which the counsel seem to place upon the validity of this objection, we must confess that we cannot perceive its force. It appears to us, that the instruction given, included in express terms, that which was asked, and then added something which made it more favorable to the prisoner. The jury were told that if they doubted whether it was the prisoner, or Yaughn, or any other person who did the act, they must acquit the prisoner. Yaughn’s case was certainly put before the jury, and the residue of the charge was in effect, (and the jury could not have understood it otherwise,) that if they had a reasonable doubt, whether the prisoner committed the murder, he was entitled to an acquittal. That reasonable doubt would necessarily be created by the supposition that Yaughn, or any other person,, might have done the act. Unless the counsel wished the jury to be told that if they did not believe that Yaughn was guilty, then they must find the prisoner guilty, even though they suspected that some other person had committed the crime, we cannot see how the prisoner was injured, or could have been injured, by the instruction given.
In the event that a new trial should be refused, the prisoner’s counsel moved in arrest of the judgment, assigning therefor two grounds.
*430 ■ 1. That in the latter part of the bill of indictment, the word “ oath ” is omitted.
2. That the bill of indictment is fatally defective, in charging that the death was caused by a “ blow ” instead of a wound.
The first ground of objection is, in our opinion, untenable. In the commencement of the indictment it is expressly stated, in the usual form, that “the Jurors for the State upon their oaths present ” &c., and that is sufficient, without repeating that the charge of murder was made upon their oaths. In the case of the State v. Kimbrough, 2 Dev. Rep. 431, it did not appear anywhere upon the record, that the grand jurors had been sworn ; yet the Court held, that as the proceedings were in a court of superior jurisdiction, it would be intended that the bill of indictment was duly found upon the oaths of a requisite number of good and lawful men. In the present case, the record states expressly that the grand jurors were “drawn, sworn, and charged, as a grand jury.” It follows, of course, that the bill of indictment, and every part of it, was found upon their oaths.
The second objection is one of much more importance and difficulty, and were we required to decide upon it according to the principles of the common law applicable to the subject, we might hold it to be a fatal one. But we are not at liberty to disregard the Act of 1811, (1 Nev. Stat. cli. 35, sec. 12) which declares that “In all criminal prosecutions which may be had by indictmeht or presentment, it shall be sufficient for all intents and purposes, that the bill shall contain the charge against the criminal, expressed in a plain, intelligible, and explicit manner; and no bill of indictment, or presentment, shall be quashed, or judgment arrested, for, or by reason of any informality or refinement, where there appears to the court sufficient upon the face of the indictment to induce them to proceed to judgment.”
The counsel for the prisoner contend that this act, unless confined within narrow limits, will destroy everything like regularity and formality in criminal prosecutions, and thus *431 withdraw from the accused that protection which the free spirit of the common law secured to them; and that', therefore, it ought to be construed strictly. Indeed, one of the counsel, Mr. JEdney, ventured to call in question the wisdom of the Act, and of the General Assembly which passed it. In that, however, he is opposed by the late distinguished CniEir Justice, who, in the case of the State v. Moses, 2 Dev. Rep. 452, used, in reference to this Act, the following language: “ this law was certainly designed to uphold the execution of public justice, by freeing the courts from those fetters of form, technicality and refinement, which do not concern the substance of the charge, and the proof to support it. Many of the sages of the law had called nice objections of this sort, a disease of the law, and a reproach to the bench, and lamented that they were bound down to strict and precise precedents, neither more brief, plain nor perspicuous, than that which they were constrained to reject. In all indictments, and especially those for felonies, exceptions extremely refined, and often going to form only, had been, though reluctantly, entertained. We think the legislature meant to disallow the whole of them, and onlj1’ require the substance, viz: a direct averment of those facts and circumstances which constitute the. crime, to be set forth.” We think that the wisdom and the beneficent operation of'the Act, are by ihese remarks amply vindicated; and. we shall not hesitate to give to it the effect to which the decisions of our predecessors have settled that it is entitled. The Act has not dispensed with the necessity of stating, in the bill of indictment, the siibstance of the charge, but it has required the courts to disregard what is merely informality or refinement. We must inquire then, what is an informalit}' or a refinement? An informality (says Judge GastoN, in delivering the opinion of the Court in State v. Gallimore, 2 Ire. Rep. 372) is a “ deviation in charging the necessary facts and circumstances constituting the offense, from tlio well approved forms of expression, and a substitution in lieu thereof of other terms, which nevertheless make the charge in as plain, intelligible, and explicit language. Such a deviation is always *432 dangerous, but, by means of such a substitution, it may be rendered a mere informality, wbicli is cured by the Statute. A refinement is understood to be the verbiage, which is frequently found in indictments, in setting forth what is not essential to the constitution of the offense, and therefore, not required to be proved on the trial.” “An informality,” (says RuffiN, C. J., in the case of the State v. Moses, case above referred to,) “ can embrace, perhaps, only the mode of stating the fact. If the fact be one essentially entering into a crime, it must be set forth: but it need not be set forth in any particular words, if other words can be found which will convey the whole requisite legal idea. Pleaders are to be much commended for pursuing the ancient, settled and approved precedents. They are the best evidence of the law itself; and it is a becoming modesty in us, the emblem of merit, to evince a marked veneration for the sages who have preceded us. But it has pleased the Legislature not to require, as a matter of duty, in all cases, what is certainly a matter of prudence and propriety.” Having thus ascertained the legal meaning of the terms “ informality ” and “ refinement,” it remains for us to inquire, whether the substitution of the word “blow” for the word “ wound,” in the indictment now before us, is such an informality as is cured by the Statute. The counsel for the prisoner contends that it is not — -that, on the contrary, it is a defect in the substance of the averment of the means whereby the deceased came to his death, and, therefore fatal: that the word “ blow ” signifies the cause only of the wound, which is the effect of the blow, from which effect the death ensues: and that such wound, being the immediate cause of the death, must be stated, instead of the remote cause, which is the blow.
The language of the Court in the case of the State v. Martin, 3 Dev. Rep. 329, to which we have referred particularly in the State v. Tom, (decided at the present term, ante 414,) goes far to support this argument. But it is to be remarked, that the Act of 1811 is not at all alluded to in that case, and the decision seems to have been put upon the strict principles of the com *433 mon law. We admit the force of the argument, provided the premises be true, that the word How in the connection in which it is used does not convey “ the whole requisite legal idea” of the means whereby the deceased was killed. The charge is, that the prisoner “ with a certain club, which he, the said Alfred W. Noblett, in both his hands then and there had and held, the said John Davis, in and upon the left side of the head, cutting the left ear, and mashing the nose and left cheek bone of him the said John Davis, then and there felo-niously, &e., did strike, giving to the said John Davis then and there with the club aforesaid, in and upon the left side of the head, cutting the left ear and mashing the nose and left cheek bone, of him the said John Davis one mortal blow, of which said mortal blow the said John Davis on, &c., instantly died.” Mr. Walker defines the word “blow,” to mean a “ strobe,” and the verb “ to mash ” of which mashing is a participle, to mean “to beat into a confused mass.” Now it seems to us that a blow or stroke with a club, which has the effect of cutting the left ear and mashing or beating into a confused mass, the nose and left cheek bone of the deceased, shows to the Court, as clearly, the means whereby the deceased was killed, as if the word wound had been used. The case of the State v. Moses, decides that the Act of 1811 dispenses with the necessity of stating the dimensions of a wound, and we think that it is equally effectual to dispense with the necessity of using the word wound, when other terms of equivalent meaning are employed.
The result of our opinion, is, that no error has been shown in the bill of exceptions, or in the record, to prevent the sentence of the law from being passed upon the prisoner; and to the end that such sentence may be pronounced, it must be certified that there is no error in the record.